## UNITED STATES of America

v.

### Henry A. MOLT, Jr., Appellant. (D.C. Crim. No. 79–00044–01)

### No. 79–1774.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1980.

Decided Feb. 12, 1980.

As Amended March 20, 1980.

---

See also, 589 F.2d 1247.

Gilbert B. Abramson (argued), Abramson & Freedman, Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Thomas E. Mellon, Jr., Asst. U. S. Atty., Chief, Crim. Div., Philadelphia, Pa., Kathryn S. Fuller (argued), Atty., Wildlife Section, Land & Natural Resources Div., Washington, D. C., for appellee.

Before GIBBONS, ROSENN, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Defendant Henry A. Molt appeals from sentences imposed following his conviction under 18 U.S.C. § 371 (1976) of conspiring to violate 18 U.S.C. § 545 (1976), and under 18 U.S.C. § 545 of knowingly importing merchandise, i. e. reptiles indigenous to Fiji, contrary to the Tariff Act of 1930, 19 U.S.C. § 1481 *et seq.* (1976). We affirm the section 545 conviction, but reverse the section 371 conviction.

## FACTS

In 1974 Molt, accompanied by Steven N. Levy and Edward B. Allen, participated in a world-wide reptile collection expedition. During the course of this expedition over 600 reptiles of varying species were collected. Molt, Allen, and Levy intended to sell the reptiles to zoos and private collections for profit.

The reptiles were first sent to a zoological park in Switzerland for safekeeping before their shipment to the United States. Of the three reptile collectors, Molt returned to the United States first. Thereafter, he instructed Levy and Allen on the mechanics of transporting the reptiles from Switzerland to the United States. Levy and Allen shipped the reptiles, arriving themselves one day before the reptile shipment. As instructed by Molt, they brought the reptiles through Customs after 5:00 p. m. to avoid Fish and Wildlife inspection. On their Customs Informal Entry Form they declared a value of $1,000 for the reptiles, although the Australian reptiles alone were worth approximately $5,500, and stated that the importation was for personal, rather than commercial, use. In addition, on their accompanying Fish and Wildlife Forms, Levy and Allen misrepresented the number and origin of the reptiles.

Levy and Allen, however, did not follow Molt's instructions in every respect. Suspicious and resentful of his past unilateral departures from group plans, they decided to proceed alone and imported the reptiles one day ahead of schedule to avoid Rudolph Komarek, a confederate of Molt experienced in the illegal importation of wildlife. Instead of taking the reptiles where originally planned, Levy and Allen transported them to Levy's home in Pittsburgh, Pennsylvania.

Subsequently, however, Levy and Allen concluded that they could not sell the reptiles without Molt's help. Accordingly, Molt, Levy, and Allen entered into a formal, written agreement providing for sale of the reptiles and division of the profits. The reptiles were removed from Levy's house, taken to Molt's place of business, the Philadelphia Reptile Exchange, and put on display. Certain reptiles, whose detection was feared, were secreted in an apartment rented by Molt. These reptiles were later transported to Allen's apartment.

In March 1975, Molt began negotiating a sale of six Fiji Island iguanas to Barney Tomberlin and James Brockett, co-owners of the Western Zoological Supply Company (Western Zoological) in Monrovia, California. The sale was subsequently finalized and the iguanas shipped by Molt to Western Zoological on April 10, 1975.

On February 14, 1979, Molt, Tomberlin, and Brockett were indicted by a federal grand jury. They were charged with conspiring, under 18 U.S.C. § 371, to violate 18 U.S.C. § 545 by dealing with Fijian wildlife knowingly imported contrary to the Tariff Act of 1930, and the Lacey Act, 18 U.S.C. § 42 *et seq.* (1976), and with committing substantive section 545 and Lacey Act violations. Before trial the government dismissed the Lacey Act charges against Molt and tried the case on its Tariff Act theory. Since Molt waived his right to a jury trial the case was tried to a judge. Tomberlin and Brockett negotiated guilty pleas, and their cases were transferred to the District Court for the Central District of California for sentencing. After a two day trial Molt was found guilty on both the conspiracy and substantive counts. On the conspiracy charge he was sentenced to one year and one day in prison. On the substantive section 545 charge he was fined $10,000, and sentenced to three years probation consecu-

tive to his one year, one day imprisonment. This appeal followed.

### SECTION 545 CHARGE

Molt advances three contentions for reversal of his section 545 conviction. First, he contends that the evidence used to convict him was obtained in violation of the Fourth Amendment. Second, he argues that, even if there were no Fourth Amendment violation, the evidence, nonetheless, was insufficient to sustain his section 545 conviction because: 1) the government failed to prove that he dealt with the Fiji Island reptiles knowing that they had been imported contrary to the Tariff Act; and 2) the government failed to prove that the illegally imported Fiji Island reptiles were the same reptiles handled in violation of section 545.

█ To prove a section 545 offense the government must prove beyond a reasonable doubt that the defendant: 1) received, concealed, bought, sold, or facilitated the transportation, concealment, or sale; 2) of merchandise after importation; 3) knowing the same to have been imported contrary to law. *See* 18 U.S.C. § 545 (1976). At trial the government relied upon the Tariff Act of 1930 as the law contrary to which the Fijian reptiles were knowingly imported. In particular, the government contended that the reptiles were imported contrary to section 485 of the Tariff Act which requires accurate representations on the value or price of imported goods as well as on all documents filed with Customs Entry Forms. *See* 19 U.S.C. § 1485(a)(2), (3) (1976). Molt argues that the government failed to establish that he knew of any misrepresentations, and that, in any case, it was not established that the iguanas sold to Brockett and Tomberlin were among those Fijian reptiles illegally imported.

█ There is abundant evidence that Molt was aware of Levy and Allen's misrepresentations on their Customs and Wildlife Forms. At trial, the government demon-

strated, through the testimony of Allen, Levy, and Komarek: that Molt was the smuggling operation's organizer and leader; that he had instructed Allen, while Allen was in Switzerland, to mislabel the reptile crates and import them after 5:00 p. m. when detection was less likely; that Molt informed Komarek, in advance of importation, that the reptiles would be illegally imported and that his aid would be needed in accomplishing the illegal importation; . that Allen and Levy related the details of their successful importation to Molt and that Molt congratulated them on their good fortune; that Molt, Allen, and Levy executed a formal, written sale and profit-sharing agreement; and that Molt, fearing detection, rented an apartment to conceal certain reptiles from federal agents. This evidence, probative of Molt's deep involvement in the smuggling operation, is sufficient, under *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), to sustain the district court's finding of a knowing importation contrary to section 485 of the Tariff Act.[1] We, therefore, reject defendant's first sufficiency of the evidence contention.

We reject his second as well. Section 545, as indicated above, prohibits the reception, concealment, purchase, sale, and facilitation of concealment, transportation, or sale of illegally imported merchandise. The indictment repeated the statutory language. In asserting that the government failed to establish the necessary relationship between the iguanas sold and the iguanas illegally imported, Molt focuses on section 545's purchase and sale language to the exclusion of its reception, concealment, and facilitation language. However, he was indicted for receiving and concealing illegally imported Fiji Island reptiles as well as for buying and selling them. Regardless of the sufficiency of the evidence to establish the latter, there was sufficient evidence to establish the former. *See supra* at 144. Therefore, Molt's second sufficiency of the evidence contention must fail.

---

1. *Glasser's* standard of review of sufficiency of the evidence contentions applies in non-jury, as well as jury, cases. *See, e. g., United States v. Goberman*, 458 F.2d 226 (3d Cir. 1972).

■ However, a determination that the evidence is sufficient to sustain a defendant's conviction does not necessitate a determination that the admission of evidence obtained in violation of an individual's constitutional rights comprises harmless error. *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). It is to that determination that we now turn.

In mid-January 1975, U. S. Customs Agents searched the Philadelphia Reptile Exchange. In that search all of Molt's business records, his cancelled checks, certain reptiles, and ten hours of taped telephone conversations were seized. Included among the items seized were three files containing correspondence with Western Zoological, and one telephone conversation in which Molt discussed with Western Zoological a possible sale of Fiji Island iguanas. When the government tried to use this evidence in a subsequent customs and wildlife prosecution the search and seizures were declared violative of the Fourth Amendment and the evidence obtained suppressed. *United States v. Molt*, 444 F.Supp. 491 (E.D. Pa.), *aff'd*, 589 F.2d 1247 (3d Cir. 1978).

In August, 1977, more than two years after the illegal January, 1975, search and seizures, Customs Special Agent Joseph O'Kane, the customs officer in charge of the Molt investigations, interviewed Harry Bock, a Philadelphia area reptile dealer. During the interview Bock admitted selling illegal Fiji Island iguanas to Western Zoological. Significantly, however, Bock provided no information relevant to Molt-Western Zoological transactions. O'Kane, while admittedly lacking independent knowledge of such Western Zoological transactions, nonetheless, caused a subpoena to be issued demanding that Brockett and Tomberlin produce all Western Zoological records relating to Molt. Brockett and Tomberlin, after having previously refused voluntarily to produce those records, acquiesced under compulsion of the subpoena. Molt asserts that these records are fatally tainted by the prior illegal search and seizure, and claims that the government's

proffered attenuating circumstances, i. e., lapse of time, zoological community rumor, and general prosecutorial awareness of wrongdoing, can not dissipate the taint. Because we conclude that assuming, without deciding, the existence of a Fourth Amendment violation, introduction of the allegedly tainted evidence was harmless beyond a reasonable doubt, we do not reach the Fourth Amendment issue.

■ The harmless error doctrine applies to constitutional, as well as non-constitutional, trial court errors. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). While the violation of certain constitutional rights automatically amounts to harmful error, *see, e. g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (coerced confession); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judges), the violation of others, such as the admission of evidence obtained in violation of the Fourth Amendment, does not. *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In the latter case, a court must determine whether the constitutional error was harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828, and whether "there is a reasonable possibility that [the constitutional error] might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. at 86–87, 84 S.Ct. at 230. Only when it can be said that no such possibility exists can a court conclude that the error was harmless. Of course, the closer the case, and the more important and persuasive the evidence wrongfully admitted or excluded, the less likely it is that a court will find the error harmless. *Chapman v. California*, 386 U.S. at 22, 87 S.Ct. at 827; *see United States v. Yeager*, 476 F.2d 613, 626 (3d Cir. 1973). The clearer the case, and the more overwhelming the untainted evidence, the more likely it is that a court will reach that conclusion. *Id.* at 616. The beneficiary of

the evidence admitted as constitutional error bears the burden of showing its admission was harmless. *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828.

■ In this case the government has met its burden. The non-Western Zoological evidence set forth above conclusively establishes a section 545 violation. Introduction of the Western Zoological evidence was merely cumulative. It was not needed to establish defendant's guilt. Since its admission could not, on this record, have influenced the trial judge's determination, and since there is overwhelming evidence of guilt apart from that obtained from Western Zoological, we conclude that the constitutional error allegedly committed when the Western Zoological evidence was introduced was harmless beyond a reasonable doubt. Accordingly, we affirm Molt's section 545 conviction.

## SECTION 371 CHARGE

Molt was convicted of conspiring to violate section 371 as well as of violating section 545. He contends that the government failed to establish that his indicted co-conspirators, Brockett and Tomberlin, knew that the six Fijian Island iguanas sold them were illegally imported. Since, failing such proof, his two alleged co-conspirators could not be convicted of the underlying substantive offense, and of conspiring to commit that offense, Molt argues that his conspiracy conviction must fall since one can not conspire with oneself to commit a crime. The government counters that Brockett and Tomberlin's knowledge was established by a letter written by defendant to Western Zoological and by Brockett and Tomberlin's pretrial guilty pleas.

■ To establish a conspiracy there must be more than one conspirator. LaFave and Scott, Criminal Law 488 (2d ed. 1972). Moreover, when knowledge is an essential element of the underlying substantive offense, it must be proven that all co-conspirators possess the requisite knowledge. *Id.* at 464–465. An essential element of a section 545 offense is, as indicated *supra*, a knowing importation of merchandise contrary to law. The government offered two items of proof to establish such knowledge: a March 3, 1975, letter from defendant to Western Zoological, and Brockett's and Tomberlin's guilty pleas.

The text of the March 3, 1975, letter is set out in the margin.[2] Nowhere does it state that the Fiji Island iguanas purchased from defendant had been illegally imported. The only statements made re illegal importation are: "we have had them since September, '74" and "Things have been pretty quiet here since the Gestapo Raid of 22 January." Neither of these statements supports an inference of knowledge of illegal importation. Taking that view of the statements most favorable to the government, we find them insufficient to support a finding of knowing illegal importation.

Brockett and Tomberlin's guilty pleas can provide the government with no solace. Under *United States v. Toner*, 173 F.2d 140 (3d Cir. 1949), and *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162

---

2. Dear Jim and Barney:

With reference to the Fiji iguanas I only have six specimens in stock. There are three true pairs. One is a pair of extra large adults. Probably a full 2 feet in length each. The other two pairs are quite a bit smaller, the 2 males are around 12 or 13 inches each and the 2 females are approximately 16 to 18 inches each.

All are perfect specimens in every respect and all have extra nice color. One female, 16 inches is probably the least colorful, but still quite good.

They have been doing quite well as we have had them since September, '74. I have kept them separate by size.

I am willing to send you what you need on a trade basis. I do not, however, want to send only male or females, but want to move them in the pairs. So, if you can use a pair or two let me know. I will look over your recent list and see what you have that I can use.

Things have been pretty quiet here since the Gestapo raid of 22 January and my lawyer has filed a motion in Federal Court to get Customs to return my property.

Did you see the Federal Register for 24 February, 1975, Injurious Animal Act proposals?

Let me know,
Hank Molt.

(1970), we doubt whether the guilty pleas of one co-conspirator can be used to prove the guilt of a fellow co-conspirator. However, on this record we need not decide that question, since the government never introduced Brockett's and Tomberlin's guilty pleas at trial. Since in the absence of those guilty pleas there remained no evidence probative of Brockett's and Tomberlin's knowledge of illegal importation, and since such knowledge was an essential element of the government's case, we reverse Molt's section 371 conviction.[3]

## CONCLUSION

The judgment of sentence on Molt's conviction under 18 U.S.C. § 371 will be reversed. The judgment of sentence on his conviction under 18 U.S.C. § 545 will be affirmed.

See also 4 Cir., 555 F.2d 403.

---

**3.** The conspiracy count did not charge a conspiracy with Levy and Allen. A separate charge of conspiracy by Levy, Allen, and Molt is pending in the district court at D.C. Crim. No. 79–341.